UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID BECKHAM,  
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,  
    Defendant.

Case No. 1:19-cv-576

Litkovitz, M.J.

ORDER

Plaintiff David Beckham brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Court on plaintiff's Statement of Errors (Doc. 10) and the Commissioner's response in opposition (Doc. 19).

**I. Procedural Background**

Plaintiff filed his applications for DIB and SSI in March 2015, alleging disability since September 22, 2013 due to a seizure disorder and anxiety. The applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ") Robert W. Flynn. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing on March 7, 2018. On July 5, 2018, the ALJ issued a decision denying plaintiff's DIB and SSI applications. This decision became the final decision of the Commissioner when the Appeals Council denied review on May 16, 2019.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2018.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since September 22, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: closed fracture of the left L1-4 transverse processes with associated hematoma; chronic biconcave deformity L3; chronic lumbago with sciatica; partial symptomatic epilepsy with complex partial seizures; tonic clonic seizure disorder; hemangoma right liver; adjustment disorder with anxiety and depression; major depressive disorder; anxiety disorder; and post-traumatic stress disorder traits (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the [plaintiff] can lift/carry up to ten pounds, stand/walk for two hours and sit for six hours in an eight-hour workday, with fifteen-minute breaks every two hours and a thirty-minute lunch break. The [plaintiff] can occasionally push/pull within the above restrictions and occasionally operate foot controls. The [plaintiff] cannot climb ladders, ropes,

scaffolds or stairs, but can occasionally climb ramps. He can occasionally balance, stoop, crouch, and kneel, but never crawl. He must be allowed the use of a hand held assistive device for walking on uneven terrain or prolonged walking, defined as more than one half hour. He must avoid even moderate exposure to extreme cold, wetness or rain; avoid even moderate exposure to vibration; avoid concentrated exposure to poorly ventilated areas and environmental irritants, such as fumes, odors, dust, chemicals and gases; and avoid all exposure to hazards, such as unprotected heights, unprotected sharp objects, unprotected bodies of water, commercial driving or the use of moving or hazardous heavy machinery. In addition, the [plaintiff] is limited to work that involves simple, routine and repetitive tasks; performed in a low stress environment, defined as free of fast-paced production requirements, involves only simple work-related decisions, few if any work place changes, all of which can be gradually introduced, no interaction with the general public, and no more than occasional and superficial interaction with co-workers and supervisors, superficial defined as no tandem tasks.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1986 and was 26 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404 Subpart P. Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

---

[1] Plaintiff has past relevant work as a lube technician, a medium, semiskilled position; a carpet cleaner, a heavy, semi-skilled position; a janitor, an unskilled, medium position; a construction worker, a semi-skilled, heavy position; and a forklift operator, a semi-skilled, medium position, in combination with material handler work, a semi-skilled, heavy position. (Tr. 28, 80-81).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative sedentary, unskilled occupations such as inspector (25,000 jobs in the national economy); addressing clerk (40,000 jobs in the national economy); and assembler (30,000 jobs in the national economy). (Tr. 29, 83-84).

> 11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from September 22, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-29).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

      **D.**     **Medical Evidence and Opinions**

      *1.*     *Suhodh K. Wadhwa, M.D.*

On November 28, 2012, plaintiff consulted with Dr. Wadhwa on a referral from the emergency room for the evaluation and treatment of seizures. Plaintiff had previously experienced a seizure on September 7, 2012 and sought treatment at Mercy South Hospital. He experienced another seizure on November 13, 2012 and sought treatment at Atrium Medical Center. Atrium Medical Center performed a CT scan, routine labs, and Dilantin anticonvulsant therapy. Plaintiff reported medication compliance. (Tr. 384). Plaintiff reported that he lost his job as a forklift and heavy equipment operator due to the seizures. (Tr. 385). Plaintiff's physical and neurological examinations were normal. (Tr. 386). Dr. Wadhwa reviewed an EEG taken on November 21, 2012, which he interpreted as "minimally abnormal secondary to brief paroxysms of irregular theta slowing, which in and of itself is not diagnostic, but may see as an interictal abnormality in a patient with seizure disorder. In addition, normal tracing does not rule out underlying seizures." (Tr. 387). Dr. Wadhwa diagnosed a seizure disorder. Plaintiff was advised that he would not be able to operate heavy machinery without clearance from the Ohio Department of Motor Vehicles and may need to pursue a different career. (Tr. 388).

*2.     CenterPoint Health*

Plaintiff established care at CenterPoint Health on April 23, 2015.  He also requested a referral to a neurologist.  He reported a history of epilepsy and past use of Dilantin.  His seizures were precipitated by anxiety, which had worsened over the past few years.  He admitted to smoking cigarettes and cannabis and using alcohol.  His physical examination yielded normal results.  Plaintiff was assessed with a seizure disorder, tobacco abuse, and anxiety.  He was referred to neurology and prescribed Prozac.  (Tr. 395-96).

On November 2, 2015, plaintiff presented with a depressed mood, primarily due to his inability to work because of seizures.  He was frustrated that he could not provide for himself and his family by working in construction.  He also reported relationship problems with his girlfriend and transportation issues.  Plaintiff did not have a driver's license and was living with his mother and sister.  (Tr. 432).  He reported memory loss and a mild intermittent tic in the right eye and left upper arm.  He also experienced anxiety and family stressors.  He was assessed with a seizure disorder and anxiety.  (Tr. 434).

On February 16, 2016, plaintiff reported continued seizures.  His MRI and EEG were normal.  He expressed frustration with the lack of a diagnosis and the effects of his impairments on his daily activities and family life.  (Tr. 503).

On May 16, 2016, plaintiff reported feeling apprehension over waiting for neurology to clarify his reported seizure disorder.  He continued to be unable to work and had concerns about possible legal trouble for nonsupport of dependents.  (Tr. 499).

### 3. *Clinical Neuroscience Institute*

Plaintiff consulted with Dr. Prem Methai, M.D., for evaluation of his seizures on May 19, 2015. He reported experiencing seizures at least two times per month. He had not taken Dilantin for over a year due to not having a neurological follow-up. Plaintiff described the seizures as a hot feeling on the back going up the right side of his neck, followed by loss of awareness, twitching and rolled back eyes, head extension to the left, arms and legs both extended or flexed, biting of tongue and check, and urinary incontinence. He described feeling hostile and confused for up to an hour following a seizure. (Tr. 402). Plaintiff's physical and neurological examinations were normal. (Tr. 404-05). Dr. Methai reviewed the 2012 EEG administered by Dr. Wadhwa and assessed plaintiff with Epilepsy, type uncertain - likely localization-related epilepsy given semiology of left head turning. (Tr. 406).

During a follow-up visit on November 16, 2015, plaintiff reported a decreased number of seizures and estimated he experienced six to eight since his last visit. He said his last seizure was in September after he had not taken medication for 48 hours. (Tr. 451). Dr. Mathai's assessment did not change. He noted plaintiff's insurance company approved an MRI of his head, and he reordered an EEG. (Tr. 455).

Plaintiff underwent an MRI of his brain on November 25, 2015, which was read to be normal. (Tr. 477). Plaintiff underwent an EEG on December 3, 2015, which was also normal. (Tr. 483).

### 4. *Fort Hamilton Hospital/Kettering Medical Center*

On June 6, 2017, plaintiff presented to the emergency department at Fort Hamilton Hospital after he had a seizure and fell from a ladder. (Tr. 555). A CT scan of the chest showed no acute abnormality. (Tr. 558). A CT scan of the abdomen/pelvis and lumbar spine showed acute vertical fractures of the left L1, L2, L3, and L4 transverse process with associated left paraspinal-psoas hematoma. (*Id.*). A CT scan of the cervical spine and head showed no acute abnormality. (Tr. 559). Plaintiff was assessed with a closed fracture of the lumbar spine without cord injury and seizure disorder. (Tr. 560).

Plaintiff presented to Kettering Medical Center as a trauma transfer from Fort Hamilton Hospital. (Tr. 534). He complained of a headache and radiating pain in his lower back. He did not have insurance and was only taking his seizure medication sparingly. (Tr. 535). A CT scan of the chest shows no acute abnormality. (Tr. 538). Plaintiff was assessed with a closed lumbar transverse process fracture, traumatic hematoma of the lower back, seizure disorder, and abrasions of multiple sites. (Tr. 539).

### 5. *Butler County Community Health*

On August 3, 2017, plaintiff was seen at Butler County Community Health for seizures and depression. He reported his seizure onset was gradual, with associated symptoms of altered level of consciousness, staring, and unresponsiveness. His last seizure occurred two months prior when he was not taking his medication. He also reported a depressed mood and feelings of guilt, primarily due to financial worries, loss of custodial rights, relationship problems, and

9

unemployment. At that time, he was taking Zoloft. (Tr. 579). His examination was normal. (Tr. 581). Plaintiff was assessed with a seizure disorder and depression. (Tr. 579).

When seen in October 2017, plaintiff reported continued seizures and back pain radiating to the lower extremities. (Tr. 587). He noted he was suffering from anxiety and staring. (Tr. 588). On physical examination, plaintiff experienced spine pain with extension. (Tr. 589). Plaintiff was assessed with a seizure disorder, chronic low back pain with bilateral sciatica, and right side lumbago with sciatica. (Tr. 587).

 6. *David Chiappone, Ph. D. - Consultative Examination*

Plaintiff was evaluated by Dr. Chiappone for disability purposes on July 31, 2015. (Tr. 421-28). Plaintiff's chief complaint was "I started having seizures." (Tr. 422). Plaintiff reported a work history of over ten jobs and noted he was let go from his most recent employment due to a seizure. He worked seasonally in construction and as a heavy equipment operator. He reported no significant disciplinary problems while working and stated he was able to follow instructions and maintain pace. (*Id.*). On mental status examination, plaintiff exhibited depressive symptoms, characterized by crying spells and feelings of hopelessness, helplessness, and worthlessness. He denied suicidal or homicidal thoughts, mania, or anger management issues. He reported weight loss and sleeping approximately four hours per night. Plaintiff rated his anxiety as 3/10 but did not present with behavioral signs of anxiety. His mental content, bodily concerns, sensory, and cognitive functioning were normal, and his insight and judgment were adequate. (Tr. 424-25). As to his daily functioning, plaintiff was able to care for himself, perform housekeeping chores, grocery shop, attend religious services, and manage funds. At the

time of this evaluation, plaintiff lived with friends and had not driven in a year. (Tr. 426). Dr. Chiappone concluded that plaintiff was not limited in his ability to understand, remember, or follow instructions. He was able to maintain concentration, attention, and persistence and pace to perform tasks. Dr. Chiappone opined that plaintiff's anxiety and depression could make it difficult for him to interact with others at times and would negatively affect his ability to cope with a high level of stress and the demands in his life. (Tr. 427-28). Dr. Chiappone suggested diagnoses of unspecified depressive disorder and unspecified anxiety disorder. (Tr. 428).

7. *Gary L. Ray, M.D. Consultative Examination*

Plaintiff was examined by Dr. Ray for disability purposes on January 22, 2018. (Tr. 600-06). Plaintiff's chief complaint was a seizure disorder, low back pain, and left leg pain. He reported a history of seizures beginning at approximately age 25. Plaintiff reported that past diagnostic testing did not reveal the etiology of the seizures, and he was told the cause might be anxiety. He also reported a spine fracture, which was treated with a brace. Plaintiff stated his low back pain was constant and exacerbated by walking. He experienced pain, numbness, spasms, weakness of the left leg, and decreased balance. His medical history was significant for anxiety, which was treated with counseling and medication. (Tr. 600). Plaintiff reported that he had lost jobs due to seizures. Plaintiff believed he could lift or carry less than 20 pounds, sit for 15-30 minutes at a time, stand for less than an hour at a time, and walk for up to 40 minutes at a time. He experienced difficulty bending, squatting, and ascending and descending steps. He was able to attend to his personal needs, but he did not drive, clean, or do yard work. (Tr. 601). Dr. Ray concluded that plaintiff's history and physical examination, along with a review of the

11

medical records, were most compatible with a tonic clonic seizure disorder of unclear etiology with continued seizures about one time per month. Dr. Ray assessed low back pain secondary to a low back spine fracture. On physical examination, plaintiff had decreased sensation at the left leg compared to the right leg and impaired memory. (Tr. 602).

Dr. Ray completed a medical source statement in which he opined that plaintiff could occasionally lift and carry up to 20 pounds; sit and stand for one hour without interruption and walk 30 minutes; sit for six hours, stand for two hours, and walk for one hour in total during an eight-hour workday; use his hands frequently or continuously to reach, handle, finger, feel, and push/pull; and use his right foot frequently and left foot occasionally. (Tr. 607-609). He was able to stoop, kneel, or crouch occasionally and never climb stairs/ramps, ladders/scaffolds, balance, or crawl. Plaintiff's vision and hearing were not impaired. (Tr. 610). Dr. Ray also found that plaintiff could never tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, or vibrations. He could occasionally tolerate exposure to humidity and wetness, dust, odors, fumes and pulmonary irritants, and extreme cold and heat. (Tr. 611). Dr. Ray also opined that plaintiff was able to perform activities like shopping, traveling without a companion for assistance, traveling without an ambulating device, using public transportation, climbing a few steps with the use of a handrail, preparing meals, caring for personal hygiene, and sorting, handling and using paper/files. However, he could not walk a block at a reasonable pace on rough or uneven surfaces. Dr. Ray concluded that plaintiff's physical limitations would last for 12 consecutive months. (Tr. 612).

> 8. *State Agency Review*

Non-examining physician Dimitri Teague, M.D., reviewed the record in July 2015 and found that plaintiff had no exertional limitations; however, due to seizures, he should never climb ladders/ropes/scaffolds, and he should be frequently limited to claiming ramps/stairs, and balancing. (Tr. 117). Dr. Teague opined that because of his seizures, plaintiff should avoid heavy machinery, driving, and unprotected heights. (Tr. 118). Non-examining physician, Abraham Mikalov, M.D., reviewed the record upon reconsideration in January 2016 and affirmed Dr. Teague's assessment. (Tr. 149-50).

State agency psychologist, Paul Tangeman, Ph.D., reviewed plaintiff's file in August 2015 and concluded that he was moderately restricted in activities of daily living; experienced moderate difficulties in maintaining social functioning; had moderate difficulties in maintaining concentration, persistence, or pace; and had experienced no episodes of decompensation of extended duration. (Tr. 115). Dr. Tangeman opined that plaintiff was able to maintain superficial interaction with others in the workplace; supervisory correction should be non-confronting and constructive; and he should have a low stress work environment with infrequent gradual changes. (Tr. 118-19). State agency psychologist, Robelyn Marlow, Ph.D., reviewed plaintiff's file upon reconsideration in January 2016. Dr. Marlow added that due to plaintiff's preoccupation with somatic symptoms, his concentration and persistence may be variable but were intact for simple tasks; he was able to maintain superficial interaction with others in the workplace, but supervisory correction should be non-confronting and constructive; and he should have a low stress work environment with infrequent gradual changes. (Tr. 151-52).

### E. Specific Errors

On appeal, plaintiff alleges that the ALJ erred in assessing plaintiff's RFC and in evaluating the vocational evidence. Plaintiff contends the ALJ incorrectly assessed an RFC that failed to include limitations for being off-task or absent from work because of seizure activity. (Doc. 10 at 3-6). Plaintiff acknowledges that the ALJ included certain restrictions in the RFC attributable to severe seizures "but inexplicably did not discuss off task or absences in that final RFC." (Doc. 10 at 5, citing Tr. 22, 24). Plaintiff also points to the testimony of the VE, who testified that an individual who was off task fifteen percent or more of the day or who was likely to be absent from work twice per month would not be within employer tolerance for work activity. (Tr. 85-86). Plaintiff argues the ALJ erred when he failed to account for the VE's testimony on absences and off task behavior on plaintiff's ability to work.

### F. Resolution

The ALJ is responsible for assessing a claimant's RFC based on all of the relevant medical and other evidence. 20 C.F.R. §§ 404.1545(a)(1), 404.1546(c). *See Bingaman v. Comm'r of Soc. Sec.,* 186 F. App'x 642, 647 (6th Cir. 2006); *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 198 (6th Cir. 2004). The claimant is generally responsible for providing the evidence that the Commissioner will use to make an RFC finding. 20 C.F.R. § 404.1512(a)(1); 20 C.F.R. § 404.1545(a)(3) ("In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity."). In addition, the claimant bears the burden of demonstrating an RFC more restrictive than that determined by the ALJ. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).

In this case, plaintiff's testimony is the only evidence supporting the work-preclusive restrictions of being off task or absent from work due to seizures. Plaintiff testified that he began suffering from grand mal seizures in 2012. (Tr. 51). Plaintiff described that after a seizure, it "feel[s] like I've been hit by a very large vehicle, like a Mack truck." (*Id.*). Plaintiff stated that when he has a seizure, it takes him a few hours to become aware of his surroundings. (Tr. 51-52). Plaintiff also testified that he has suffered from the grand mal seizures two to three times a month for at least three and a half to almost four years. (Tr. 54). If plaintiff's testimony was fully accepted by the ALJ, he would arguably be off task or absent with a frequency that would preclude substantial gainful activity in accordance with the VE's testimony.

"An administrative law judge is only required to include in the residual functional capacity those limitations he finds credible and supported by the record." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). In assessing plaintiff's RFC, the ALJ considered the evidence showing plaintiff's seizures improved with medications and, conversely, were worse when he missed or reduced his medications; the diagnostic and objective medical evidence; plaintiff's level of treatment; plaintiff's activities of daily living; and the medical source statements of record. The ALJ also considered plaintiff's testimony but did not fully credit plaintiff's alleged limitations because the record as a whole did not support the severity, intensity, or frequency of the limitations he alleged. (Tr. 24). For the reasons that follow, the ALJ's RFC finding is supported by substantial evidence, and his failure to include additional restrictions in the RFC for being off task or being absent from work is not reversible error.

15

As the ALJ reasonably noted, plaintiff seizures improved with medications and were worse when he missed or reduced his medications on several occasions. (Tr. 24). Progress notes from April 2015 indicate that an aggravating factor for plaintiff's seizures was missing medications, while alleviating factors included compliance with medications and maintaining therapeutic drug levels. (Tr. 395). In November 2015, plaintiff reported his last seizure was in September "in the context of not having medications for 48 hours." (Tr. 451). In June 2017, plaintiff reportedly fell off a ladder after having a seizure, and he reported to emergency department doctors that he had been taking his seizure medication sparingly. (Tr. 535). Emergency department records from July 2017 indicate plaintiff was recently released from jail and was out of medications. (Tr. 650). In August 2017, plaintiff reported his last grand mal seizure was two month ago when he was off his medications. (Tr. 579). On October 3, 2017, plaintiff reported having only two seizures with staring and unresponsiveness, clearing in one to two hours, and no grand mal seizures since his last visit in August 2017. (Tr. 587, 693). The following week, plaintiff reported that since he had been back on his medication, he had not had a seizure. (Tr. 687). Progress notes from January 2018 state that plaintiff had a slight increase in the frequency of generalized seizures since he ran out of the medication Keppra. He reported two tonic clinic seizures in the six weeks when he was not taking Keppra. (Tr. 683). This evidence substantially supports the ALJ's conclusion that the level of seizure activity was affected by plaintiff's compliance with taking his medication.

In addition, the ALJ considered that plaintiff was not fully compliant with his doctor's recommendation to follow through with a neurological evaluation. In October 2017, plaintiff

16

reported he had been taking his medication consistently but had not followed through with his referrals. (Tr. 686). Plaintiff further reported that his primary care physician would not sign paperwork stating he could not work because the physician "does not have documentation from neurology and previous PCP (primary care physician) to confirm [his] seizure disorder diagnosis." (Tr. 687).

The ALJ also reasonably considered that the diagnostic clinical findings were inconsistent with plaintiff's allegations regarding the severity of his seizure impairment. (Tr. 25). An EEG in November 2012 was "minimally abnormal." (Tr. 455). A November 2015 MRI of plaintiff's brain was normal. (Tr. 477). The following month, plaintiff's EEG was normal. (Tr. 483).

The ALJ further considered that plaintiff's level of treatment was inconsistent with his allegations regarding the severity of his seizure disorder. (Tr. 24). As the ALJ noted, plaintiff did not require inpatient hospitalization, frequent emergency treatment, or intensive treatment with specialists. (Tr. 24). In addition, the ALJ explained that plaintiff engaged in a somewhat normal level of daily activities. (Tr. 26). Finally, the ALJ fully discussed the medical opinion evidence, included restrictions assessed by these doctors to accommodate plaintiff's seizures, and included additional restrictions based on the overall record evidence. (Tr. 26-27). The Court notes that none of the physicians who opined on plaintiff's physical and non-exertional limitations included any restrictions for being off task or for absences from work.

Plaintiff has not pointed to any medical opinion evidence indicating that plaintiff's seizures were so frequent that he would be off task for fifteen percent of the workday or absent

17

from work two days per month. Plaintiff has failed to cite to any other medical evidence supporting his argument that the ALJ should have imposed additional restrictions in the RFC for being off task or for absences from work. Nor does plaintiff explain why his alleged limitations were more severe than those assessed by the ALJ. The ALJ reasonably concluded that plaintiff's subjective allegations regarding the frequency and consequences of his seizures were inconsistent with the evidence showing plaintiff's seizures improved with medication compliance, the diagnostic and objective medical evidence showing normal findings, the level of plaintiff's treatment and his daily activities, and the absence of any medical opinion imposing the restrictions plaintiff now says should have been included in the RFC. On this record, plaintiff has not met his burden of demonstrating that the RFC assessed by the ALJ was not supported by substantial evidence.

Plaintiff also argues that the ALJ failed to fully consider the VE testimony "that accurately portrays [plaintiff's] severe seizures." (Doc. 10 at 5). In addition to testifying to plaintiff's past relevant work and other jobs he could perform in the national economy, the VE testified that an individual who is off task more than fifteen percent of the time "would eventually fall too far behind and eventually be terminated from any job." (Tr. 85-86). The VE further testified that being absent two times per month would be "excessive for an employer, and the individual would eventually be terminated if the individual continued to miss two days per month. It would not be tolerated." (Tr. 86).

Plaintiff is correct that the vocational expert testified that these limitations would be work-preclusive. However, the fact that the ALJ asked about the residual functional capacity of

18

a hypothetical person with particular limitations does not mean the vocational expert's answer is binding on the ALJ. Simply posing a hypothetical question to the VE does not result in a finding about a claimant's RFC or bind the ALJ where the medical record does not support the inclusion of such limitations. *Lipanye*, 802 F. App'x at 170 (citing *Kessans v. Comm'r of Soc. Sec.*, 768 F. App'x 531, 536 (6th Cir. 2019)). As explained above, the ALJ's RFC finding is supported by substantial evidence, and the ALJ was not required to accept VE testimony based on limitations that were not consistent with the RFC finding. Plaintiff has failed to show the ALJ erred in this regard.

In sum, plaintiff has not shown that the ALJ erred by failing to include restrictions in the RFC for being off task or absent from work. The ALJ thoroughly evaluated the medical evidence related to plaintiff's seizure disorder and explained his reasons for including the functional restrictions related thereto in the RFC. Plaintiff has not shown that the evidence before the ALJ required the inclusion of greater limitations than those found by the ALJ. Nor has plaintiff shown the ALJ erred when he failed to rely on VE testimony that did not accurately reflect plaintiff's functional limitations from his seizure disorder. Plaintiff has not met his burden of proof to show the ALJ's RFC finding is not supported by substantial evidence. Therefore, plaintiff's assignments of errors are overruled.

It is therefore **ORDERED** that the decision of the Commissioner is **AFFIRMED** and this matter is **CLOSED** on the docket of the Court.

Date: __8/26/2020_____

_Karen L. Litkovitz_
Karen L. Litkovitz
United States Magistrate Judge